UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

**UNITED STATES OF AMERICA**

v.                          CRIMINAL ACTION NO. 2:12-00101

**KEVIN WAYNE BRITTON**

MEMORANDUM OPINION AND ORDER

Sentencing in the above-styled matter occurred on September 10, 17 and 19, 2013. The court adopts all of the paragraphs of the presentence report except the following to which the defendant fully objects, namely, 71, 81, 85 through 88, 95, 96, 100, 124 and 128, and except also the portions of paragraphs to which the defendant partially objects, namely, 59, 94, 97, 98, 99, 102 and 103. Pursuant to the presentence report to the extent not subject to an objection by the defendant, and the evidence adduced during the course of the sentencing proceedings and hearing, the court makes the following findings of fact by a preponderance of the evidence. It is noted that references to the defendant and his company, Britton's Gun and Pawn Shop, Inc. are used herein interchangeably.

## I.

The defendant, Kevin Wayne Britton, is a 43-year old male who graduated from high school in 1988. He worked as a coal miner from 1990 to 2003. In 2003 he incorporated Britton's Gun and Pawn, Inc., operating as Britton's Gun and Pawn shop, in Danville, Boone County, West Virginia. He obtained a federal firearms license which permitted him to sell firearms in West Virginia. He operated the business out of his building in which he displayed his firearms in the showroom in the front and stored others in the back. He stored additional firearms in a separate building behind the first building, as well as at his residence.

He bought and sold thousands of firearms from 2003 to December 31, 2007, when his license was revoked by the Bureau of Alcohol and Firearms ("ATF") and his business was shut down. In 2007 alone he acquired over 1300 firearms. After the ATF audit in January 2008 following the shutdown, he was allowed to keep nearly 1,100 firearms. He was not a complete record keeper of his inventory of pawned and owned firearms and failed to enter in his Acquisition and Disposition ledger many of the firearms pawned with or acquired by his company.

When ATF conducted a compliance audit of his business from December 24, 2006 to March 2007, he had an inventory of 1,207 firearms.  The audit did not discover any stolen firearms, prohibited weapons or sales to or purchases from a prohibited person.  A random check of nine firearms found none stolen.  Nevertheless, the defendant has unquestionably from time to time knowingly dealt with stolen property, largely firearms, particularly in the year 2007.

II.

Jerry Messer, regarded by some in Boone County as a thief, both sold and pawned firearms to the defendant and his business on numerous occasions.  Boone County Deputy Sheriff Delmar Browning, now recently retired, has a liking for guns.  He visited Britton's shop almost daily or at least two times per week.  More than a month prior to November 2007, Deputy Browning told the defendant that Messer was known as a thief and a user of drugs.  The defendant told Deputy Browning that he would not do business with Messer.  In July 2007, Brian Sivori had informed the defendant that Messer, his daughter's boyfriend, was stealing property and selling it.  In November or December 2007, Deputy Browning asked the defendant whether he was taking anything from Messer and the defendant said he was not.  It

appeared then to Deputy Browning that the defendant was taking his advice.

Thus, when Jerry Messer brought a Stag Arms .223 caliber M-4 rifle stolen by him from the home of Rockney Stevens a few days after November 10, 2007, and pawned it with the defendant in exchange for cash, the defendant knew or reasonably should have known that the firearm was stolen.

Similarly, when Messer brought three firearms, as well as a guitar, that had been stolen by him from the home of Keith Phipps on December 28, 2007, and that same day sold those four items, valued at $3,100, to the defendant for $300, the defendant knew or reasonably should have known all three firearms and the guitar were stolen.  The three firearms are described as follows:

> Smith & Wesson .40 caliber handgun
> Winchester 30-30 Sears Roebuck
> Winchester 12 gauge shotgun

Chelsea Sivori stole a number of items from her family's home including two guns.  She pawned them with the defendant for money she used to buy drugs.  One of the guns was a Remington .270 caliber rifle.  The transaction was entered on the defendant's books as occurring on March 30, 2007.  The other gun may be a Ted Williams 12-gauge pump shotgun.  Both guns were

4

owned by her father, Brian Sivori. She informed the defendant at the time of the pawn of one of the two firearms that it belonged to her father. The defendant received it nevertheless.

When Brian Sivori realized the guns were missing, he learned that Chelsea was dating Jerry Messer and that Messer was actively stealing property and then selling it. Brian Sivori came to Britton's in early July 2007 to determine whether the guns may have been pawned there, advising the defendant that Jerry Messer was stealing property and selling it. The defendant looked in his books and, despite the March 30, 2007, entry, informed Brian Sivori that he could find no record of the firearms and said he did not have either of them. Inasmuch as Chelsea had informed the defendant that one of the two guns she pawned belonged to her father, the defendant knew or reasonably should have known that the firearm then being pawned was stolen property.

Dr. Cliff Hill reported the theft of two pistols from his residence as occurring sometime between May 20 and May 31, 2007. He reported the thefts to authorities on August 19, 2007, and contacted the defendant several times about the stolen firearms. One of the pistols was a Colt Gold Cut .45 that was both quite distinctive and very expensive, and was thought by

5

Dr. Hill to be easily recognizable due to its high quality and value.  The other was a Beretta .40 caliber pistol.  The defendant responded to Dr. Hill that he was looking for the pistols, but was unable to locate them.  In 2008, both pistols were recovered by law enforcement officers from the defendant's residence.  In view of the high quality and value of the Colt Gold Cut .45 caliber pistol that the defendant had received and removed to his residence, the defendant knew or reasonably should have known that distinctive weapon was stolen and that the Beretta .40 caliber also secreted to his residence was stolen as well.

Apart from stolen firearms, the defendant on June 23, 2007, transported about 30 firearms to a flea market in Paintsville, Kentucky, where he put those weapons on display for sale in the bed of his truck.  He neatly grouped them separately as handguns and rifles, and displayed business cards for Britton's Gun and Pawn shop.  Notwithstanding the limits of his federal firearms license to West Virginia, the defendant acted on that occasion as a firearms dealer and sold at least one of those firearms, a Rossi .308/20 gauge rifle, for the sum of $350 to a confidential informant working with an ATF agent.

In addition, the defendant received in his possession in October 2007, by a pawn by Timothy Miller, a Streetsweeper 12 gauge shotgun.  A Streetsweeper is classified as a destructive device under 26 U.S.C. § 5845 because it has a bore greater than one-half inch and, in fulfillment of the direction contained in the statute, the Streetsweeper has been found by the Secretary of the Treasury in ATF Ruling 94-2 as "not particularly suitable for sporting purposes."  The interior of the bore on the defendant's firearm was 50% greater in size than the one-half inch limit in that the bore, measured at .753 of an inch, was three-fourths of an inch in diameter.

The defendant showed the Streetsweeper to a frequent visitor at his store, Deputy Browning, who hunts with a 12-gauge shotgun as well as smaller bore 16-gauge and 20-gauge shotguns. He knew, without anyone telling him, that it was a Streetsweeper.  He did not recognize it as illegal, though he did know that he would not hunt with it, that it had no sight, that it did have a bore that was clearly greater than one-half inch, and that it would not be used for target practice unless one had a lot of ammunition to waste.  He did not know whether any government official had determined whether or not the Streetsweeper was generally suitable for sporting purposes.

7

Aside from the obvious oversize bore, the defendant was alerted to its potential illegality by one of his frequent customers, James Fankhauser, in about December 2007.  Mr. Fankhauser, to whom the defendant was displaying the weapon, asked the defendant whether it was legal.  Mr. Fankhauser didn't know what anyone would do with it.  He thought it was not only illegal, but that it was a "killing machine," a phrase he agreed was applicable also to an AR-15 with a high volume magazine, as well as an SKS and an Uzi.

The defendant by the time he acquired the Streetsweeper in October 2007 had been a firearms dealer for four years, had handled thousands of firearms by purchase, sale and pawn, and had been through an extensive ATF audit that was completed in March 2007.  The defendant, prior to the execution of the search warrant in December 2007, knew or reasonably should have known that the Streetsweeper was an illegal firearm that had not been registered as required by statute in the National Firearms Registration and Transfer Record.

III.

It is suggested that the defendant has engaged in other acts of unlawful possession or unlawful distribution.

In December 2005 Brandi Williams purchased a Cobra .380 caliber pistol that she had selected, using the money of Charles Bias.  At that time they were married and the parents of an infant daughter.  Brandi normally kept his money.  The defendant was aware that Bias, who on several occasions had brought items to sell to the defendant, was a convicted felon.  The defendant had told him that the defendant could not and would not sell a firearm to him because he was a convicted felon.  At the time Brandi bought the firearm the defendant asked him to leave the place of business while the transaction with Brandi was concluded.  Bias did so.  He testified that he did not tell the defendant that the gun was actually for him.  Bias has, on an earlier occasion when he was in jail, given a sworn statement before a notary that the firearm was not for him and that Brandi never had the firearm around the house, though he admits to having fired the weapon.  Bias now repudiates that sworn statement.  Bias has also stated on still another occasion that he helped Brandi pick out the Cobra .380.  The court finds the credibility of Bias to be lacking.  Aside from his

9

inconsistent statements, he is a twice convicted felon who is currently on bond on a charge of soliciting a minor by text. The court finds that an unlawful distribution of the Cobra .380 pistol by the defendant to a convicted felon is not shown by a preponderance of the evidence.

James Fankhauser was a frequent customer of Britton's. His wife Teresa also purchased a number of firearms there. On at least one or two occasions, James had Teresa purchase one or more firearms for him in order to avoid a five-day wait period he had come to experience because of his arrest for what appears to have been a charge of domestic assault arising out of a scuffle with his nephew. The charge was promptly dismissed. James acknowledged that he had previously discussed the five-day wait restriction with the defendant but, he testified, "I don't even know what was said at the time." Each James and Teresa are owners of firearms. James owns eight and Teresa owns five or six. James is not, as pertains to firearm possession, a prohibited person. Inasmuch as there was nothing unusual about Teresa purchasing her own firearms, there is no reason to believe the defendant knew or reasonably should have known that she was purchasing at any time for James in order to avoid a waiting period.

In the ATF audit following the December 31, 2007, shutdown of the defendant's business, there was found in the inventory of the defendant's firearms a High Standard, Model Sentinel, .22 revolver with an obliterated serial number. It was obtained in November 2006 as one of eight firearms pawned by Dreama Dean, as reflected on a pawn ticket. It was not entered in the A&D books until the ATF audit that ended in March 2007. During that audit it was logged into the books by an employee, Davey Brown. Those same books show that the Sentinel was returned to her on February 5, 2007. Nevertheless, it remained in or was returned to the inventory.

An examination of the weapon shows a slightly shaded area on the metal frame of the revolver just above the trigger guard. The surface appears to be smooth, though there are some scratches on it. The slightly shaded area, located where a serial number would likely be positioned, is not particularly prominent. It is the only firearm with an obliterated serial number found in the defendant's extensive inventory. The weapon is an old one whose age may have indicated that a serial number was not required at the time it was manufactured. In view of the foregoing and inasmuch as the defendant's inventory contained 90 other firearms that legitimately contained no

serial number and inasmuch further as the weapon was listed on the books and was apparently overlooked by ATF in its audit ending March 2007, the court finds that the defendant is not shown by a preponderance of the evidence to have known or that he reasonably should have known that the serial number on the Sentinel had been obliterated.

For lack of probative evidence, the court finds that none of the following firearms suggested by the United States as being within USSG § 2K2.1(b)(1) (number of firearms) are appropriately included.

> Any firearms attributed to Chelsea Sivori except for the one found above.
>
> Any of the firearms attributed to Heather Morris.
>
> Any of the firearms displayed at Paintsville, Kentucky, except for the one found above.

Consequently, the number of firearms the defendant unlawfully possessed or unlawfully distributed is nine, as set forth in Part II above, falling in the 8-24 category specified in USSG § 2K2.1(b)(1).

IV.

The specific offense characteristic of trafficking in firearms (USSG § 2K2.1(b)(5)) is conceded by the government not to apply inasmuch as the required minimum of two firearms is not shown.  In addition, the court finds that the specific offense characteristic of using or possessing a firearm in connection with another felony offense is not shown inasmuch as the defendant has not been found to have been engaged in the business of receiving and selling stolen property.

V.

Application of USSG § 3B1.1, aggravating role in the offense, is an awkward fit in this case.  The court does not find that the defendant, as a pawnbroker and buyer of firearms and other goods, was part of a ring that included thieves who were encouraged by him to steal and then pawn the stolen items with him or sell them to him.  As has been noted, the defendant has not been found engaged in the business of receiving and selling stolen property.  In any event, the defendant did not exercise decision making authority over the activities of thieves who brought him goods for pawn or sale nor did he exercise any degree of control and authority over them.  He did,

13

of course, set a price for each item anyone brought forth - a price that could freely be accepted or rejected or, possibly, negotiated. The defendant is not shown to have recruited any of those individuals nor did he plan or organize their thefts. Some of them dealt with other pawnbrokers as well, and all of them were free to do so. In sum, the defendant was not an organizer, leader, manager or supervisor of any of the thieves who did business with him, whether or not he knew or reasonably should have known that the goods presented to him were, on a given occasion, stolen.

## VI.

The government suggests that an enhancement for obstruction of justice should be applied. The court believes the most serious ground advanced by the government is the defendant's assertion in his motion to dismiss filed on September 27, 2012, that federal authorities agreed not to prosecute him on federal charges in exchange for his surrender of his federal firearms license. That alleged agreement is said by him to have occurred on December 31, 2007, when he was being interviewed by ATF Special Agent Shannon Sullivan (now Wamsley), who was accompanied by ATF Investigator Brian Davis. The court has heretofore found on the record that no such agreement

existed.  Nevertheless, the court recognizes that the defendant, who was under considerable stress at the time of the Sullivan interview, may have misunderstood what was meant when he was told that the surrender of his license would relieve him of "regulatory penalties."

Another matter of particular significance is the defendant's attempt to distance himself from some aspects of the sale of the Rossi .380/20 gauge rifle at the Paintsville, Kentucky, flea market, which has been detailed above.  The defendant has stated both that he did not own the firearm and that he did not take it to the Kentucky flea market, neither of which has been substantiated.  When confronted with proof of the Paintsville sale by the government, the defendant does acknowledge that he did make the sale itself.

While these and a few factual positions of lesser note that have been taken by the defendant are disturbing, the court concludes that the defendant has not willfully obstructed or impeded or willfully attempted to obstruct or impede the administration of justice in the investigation, prosecution and sentencing of the offense of conviction and relevant conduct.

Although the defendant has attempted to minimize his conduct both when initially apprehended and during the course of this case, the court nevertheless finds, on balance, that the defendant has accepted responsibility.

## VII.

Accordingly, the court finds the appropriate guideline for a conviction under 18 U.S.C. § 1512(c)(1) to be USSG § 2J1.2.  Pursuant to the cross-reference at USSG § 2J1.2(c), if the offense involved obstructing the investigation or prosecution of a criminal offense, as in this case, USSG § 2X3.1 (Accessory After the Fact) is to be applied.  This guideline states that the Base Offense Level is six levels lower than the offense level for the "underlying offense."  The court further finds, as set forth in the presentence report, that the underlying offense in this matter is the receipt of stolen property covered under USSG § 2B1.1, and inasmuch as the stolen property primarily involved firearms, the appropriate guideline for applying USSG § 2X3.1 is USSG § 2K2.1.

The court finds that the "offense" as defined in the guidelines, involved a destructive device, that is, a Streetsweeper 12-gauge shotgun, resulting in a Base Offense Level of 18.  The defendant is assessable with four additional

16

points for the possession of nine firearms pursuant to USSG § 2B1.1(b)(1)(B). Another two points are appropriately added pursuant to USSG § 2K2.1(b)(3)(B) because the offense involved a destructive device, bringing the defendant's offense level to 24. Pursuant to USSG § 2X3.1, the offense level is six levels lower than the offense level for the "underlying offense," resulting in an Adjusted Base Offense Level of 18. With credit for acceptance of responsibility, the defendant's Total Offense Level is 15, with a Criminal History category of I, yielding an advisory guideline range of 18 to 24 months.

The Probation Office is directed to make a copy of this order, along with the Judgment and Commitment Order, and forward both to the Bureau of Prisons and the United States Sentencing Commission.

The Clerk is directed to forward copies of this memorandum opinion and order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

DATED: September 24, 2013

_____
John T. Copenhaver, Jr.
United States District Judge

17